Filed 11/25/25  In re O.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re O.H. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br>    Plaintiff and Respondent, | E085170 |
| v. | (Super.Ct.No. DPSW2400185) |
| J.H. et al.,<br>    Defendants and Appellants; | OPINION |
| O.H. et al.,<br>    Appellants. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.

Affirmed.

Rich Pfeiffer for Defendant and Appellant Jacob H.

Leslie A. Barry for Defendant and Appellant Janet H.

Tracy M. De Soto, under appointment by the Court of Appeal, for Appellants.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar,

Deputy County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

Seven-year-old O.H. and five-year-old A.H. were removed from the care of their parents, Janet H. (Mother) and Jacob H. (Father), by a protective custody warrant after Father was arrested on charges of possessing child pornography.

Following the children's removal, the Riverside County Department of Public Social Services (the Department) filed a dependency petition alleging the children were at risk of harm based on Father's possession of child pornography and Mother's knowledge or apparent knowledge of it and minimization of the allegations. While the matter was pending, the foster parents reported that both children were engaging in masturbation, and that the children had disclosed both that they used to take showers together as a family and that their parents taught them how to masturbate when they were two years old.

The parties proceeded to a contested jurisdictional and dispositional hearing. At the close of the hearing, the juvenile court sustained the petition, removed the children from both parents, and over the children's objection, ordered the Department to provide family reunification services to both parents.

Mother, Father, and the children all appeal. The parents challenge the juvenile court's jurisdictional findings and the dispositional order removing the children from Mother. The children challenge the denial of their request to bypass reunification services.

2

We conclude that substantial evidence supports the juvenile court's jurisdictional findings and removal order, and that the juvenile court did not err in ordering family reunification services. Accordingly, we affirm.

## BACKGROUND

In May 2024,[1] Mother and Father were married and lived together with their two children, a son, O.H. and a daughter, A.H.

A. *The Investigation and Father's Arrest*

On May 17, Google flagged Father's accounts and submitted a cyber-tip to the National Center of Missing and Exploited Children. The tip, which contained 17 image files of possible child sexual abuse material, was forwarded to the local police department in Riverside, California. Detective Amber Marcinko, who was assigned to the Riverside County Child Exploitation Team, reviewed the files and described several of them in her report. One of the files was a screenshot of a video. It depicted a male child, approximately 10 to 12 years old, lying on a bed in the nude with a female adult. The female adult had the tip of the child's penis in her mouth. Another file was a "selfie" photograph of a female child, approximately 14 to 16 years old. The child was nude and exposing her breasts and vagina. There were also three close-up photographs of the vaginal area of a child that appeared to be under the age of 10 with a Hello Kitty blanket in the background, and photographs of a child's vagina and a child's penis that appeared to have rashes on them.

---

[1] All further date references are to the year 2024, unless noted otherwise.

On May 21, law enforcement went to the family home to execute a search warrant. Detective Marcinko spoke with both parents. Father said he did not know what images caused Google to close his account. He tried to challenge the closure but was unsuccessful. Father denied having any child pornography, although he said he may have a couple photographs of his children's genital areas. The photographs were taken around 2020 or 2021 when the children were in diapers and had rashes. Father said he sent the photographs to the children's doctor. Father had no explanation for the other child pornography files in his Google account and said he had no knowledge of it. Mother confirmed that they had taken pictures of their children's genital rashes and had sent the photographs to their doctor.

Mother and Father each gave the officers permission to search their cell phones. No child pornography (i.e., photographs or videos involving actual children) was found on the initial "preview" search of the parents' phones, although Father's phone contained hundreds of anime images depicting children engaging in various sexual acts.[2]

The parents' cell phones and a tower computer were seized by law enforcement and later forensically examined. Father's cell phone contained thousands of files depicting adult pornography, two photographs of sex acts being done to female subjects who were "age difficult," and eight animated images of child sexual activity. Mother's cell phone contained "a single cached thumbnail of an image" depicting a prepubescent

---

[2] Anime is a style of animation that originated in Japan. It includes hand-drawn and computer-generated images. (https://en.wikipedia.org/wiki/Anime.)

male's penis with a possible red dot just above it. The original image was not found on the phone.

The tower computer contained thousands of files depicting adult pornography. There was also a zip file entitled, "My_sister_is_a_pervert!!" that contained over 100 computer-generated images of a prepubescent girl engaged in sexual activity with an adult. As characterized by Detective Marckino, some of the images involved "aggressive and violent sex acts." Detective Marcinko described some of the images in her report. Image 124 was an image of a female child between 8 and 10 years old, sitting on a chair in the nude. Her hands and legs were bonded to the arms of the chair and an adult male "had inserted a large penis[-]like vibrator into the female juvenile's vagina … [and] had his penis inserted into the female juvenile's anus. The female juvenile was screaming." Images 49 and 50 were images of a female child between 8 and 10 years old, lying on her back in the nude, while an adult male "used his hands to grab around the female juvenile's neck and forced his penis into her mouth." Image 72 was an image of a female child between 8 and 10 years old, who was in the nude and being held by an adult male. "The female juvenile's legs were being held opened by the adult male's arms. The adult male had his penis inserted into the female juvenile's vagina. The female juvenile was crying and screaming." The forensic examination of the tower computer also revealed that on July 8 and December 23, 2023, Father's user account conducted a keyword search for the term "'lolita'" on an anime website that included sexual content.

Father was arrested on May 21 and later charged with felony possession of child pornography. (Pen. Code, § 311.11, subd. (a).) Father's parents posted bail and Mother picked Father up from the jail.

The day after Father was arrested, Detective Marcinko and a social worker went to the family home. Mother, Father, and both children were at home. The social worker spoke with each of them.

O.H. denied any sexual abuse and denied that his parents had ever taken a photograph of his private parts. O.H. disclosed that a year ago his parents made him do something that he did not want to do, but he said he did not remember what happened.

A.H. told the social worker that Mother said Father was arrested because Father had taken pictures of A.H.'s private parts when she had a rash. A.H. said her parents only take photographs of her vaginal area if it is an "emergency." A.H. said the last time her parents had taken a photograph of her vaginal area was when she was five years old (A.H. was five years old when she said this). A.H. also denied any sexual abuse. She said Father makes her do things she does not want to do, but when asked about what type of things, she said she did not remember. She also said Father touched her buttocks when she was two, and that the last time she took a shower with Father she was three. Both children said they felt safe at home.

Mother told the social worker that she had full access to Father's electronic devices and had not seen any child pornography. Mother acknowledged that she and Father had taken pictures of their children's genital rashes to send to the doctor, but said she did not know that having those photographs was considered child pornography.

6

Mother acknowledged that she and Father watched adult pornography together, but denied watching child pornography. Mother said it was not illegal to watch anime child pornography and she expressed no concern about it. Mother did not believe the charges against Father were true. She speculated that the images Detective Marcinko recovered may have been downloaded without Father's knowledge through the Telegram application. Mother denied that she or Father had ever sexually abused the children and said that she would still leave the children with Father. Mother told the social worker that on the advice of her attorney, the children would not be participating in a forensic interview.

Father acknowledged that he had photographs of the children's genitals that were taken to send to their doctor. He denied having any other child pornography images and denied sexually abusing his children. Father explained that he uses an application on his phone called Telegram, which consists of different chatrooms, some of which contain explicit photographs and videos of adults. Father said that sometimes Telegram "'auto downloads'" images. He suggested that was how the anime images ended up on his phone. He said sometimes random anime images would pop-up when he was on Telegram, but he would dismiss them quickly.

When asked about prior abuse allegations, Father acknowledged that one of his sisters had made sexual abuse allegations against him and the paternal grandfather, but he said the allegations were not true. The social worker confirmed there were prior referrals that alleged Father had sexually abused a paternal aunt and uncle, both of whom were minors at the time. There were nine referrals between June 2008 and September 2011

7

that alleged Father sexually abused his minor sister. Father was 18 at the time of the referral in June 2008, while his sister was 12. There was also a referral from 2013 that alleged Father had sexually abused his minor brother. All of the referrals were deemed unfounded, inconclusive, or evaluated out.

Mother and Father both declined services and agreed that Father would stay with the paternal grandparents during the investigation. Father packed a suitcase and left the home.

On May 23, two days after Father's arrest, the children were removed from their parents' care by a protective custody warrant. The children were placed with a paternal aunt and uncle in Los Angeles County.

B. *The Petition*

On May 28, the Department filed a dependency petition. The petition alleged that A.H. was subject to juvenile court jurisdiction under Welfare and Institutions Code[3] section 300, subdivisions (b)(1) and (d) (failure to protect and sexual abuse), and that O.H. was subject to jurisdiction under section 300, subdivisions (b)(1) and (j) (failure to protect and abuse of sibling).

The failure to protect allegations (b-1 and b-2), alleged that Father's prior referral history, along with his possession of child pornography and images of the children's genitals, which had resulted in his arrest, placed the children at risk of harm; and that Mother knew, or reasonably should have known, that Father possessed child pornography

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

8

and images of the children's genitals, yet she minimized the severity of the allegations and continued to allow Father to have access to the children.

The sexual abuse allegations (d-1 and d-2) were similar, but were specific to A.H. They alleged that Father's possession of child pornography and images of A.H.'s genitals, which had resulted in his arrest, placed A.H. at risk of sexual abuse; and that Mother knew, or reasonably should have known, that Father was in possession of child pornography and images of A.H.'s genitals, yet she failed to take any protective measures, such as contacting law enforcement, and she continued to minimize the severity of the allegations and continued to allow Father to have access to the children.

The abuse of sibling allegation (j-1) alleged that because A.H. was abused or neglected under section 300, subdivision (d), O.H. was at a similar risk of harm.

C. *The Detention Hearing and Setting of the Jurisdictional and Dispositional Hearing*

The detention hearing was held on May 29. The juvenile court found the Department made a prima facie showing that the children came within section 300, subdivisions (b), (d), and (j). The court ordered the children detained from both parents. The court further found that Father was the presumed father of the children and ordered supervised visitation for both parents. The court authorized the Department to return the children to Mother upon confirmation that Father was no longer living in the home, and the Department believed Mother could be protective of the children. The court stated that Mother needed to show "that she won't minimize what is going on with her spouse and his viewing of child pornography." The court did not care if the images were described "as anime child pornography or AI child pornography, it still is indicative of an interest

9

that is a danger to these children, especially in light of the photographs that were found on his phone."

After the detention hearing, the social worker interviewed the parents about the allegations. Father said he was not aware of any child pornography on his phone. He acknowledged that he had photographs of his children's genital rashes, but said those pictures were taken for medical purposes and sent to the children's doctor. Father was under the impression that the police did not find any other images of child pornography on his phone. Father later told the social worker that California law requires child pornography to be images of actual children. He said anime is not illegal and is not considered child pornography.

Mother emailed the social worker her response to the allegations. Mother said she had no knowledge of any child pornography in her house. She said she knew about the genital photographs because they sent pictures of the children's rashes to their pediatrician. Mother explained that during the Covid-19 pandemic, they had to communicate with their doctor over email for non-urgent medical issues. Mother said she forwarded the social worker copies of messages they sent to their pediatrician and after-visit summaries that showed the children were treated for diaper rashes and were prescribed medication.[4] Mother also said that when the social worker interviewed her the

---

[4] The messages and after-visit summaries were not included in the record, although it appears the social worker did receive the information, as she later attempted to contact Dr. Roshunda Coleman, the pediatrician who treated A.H. "on May 21, 2029, [*sic*] when [A.H.] was two months old for a diaper rash." There is no indication the social worker ever spoke with Dr. Coleman.

10

day after Father was arrested, she was still in shock and had not yet processed everything that happened. She said she understands the allegations are severe, and she takes them seriously. She said Father has not been to the family home since May 29.

As a measure to help build trust with the Department, Mother offered to give the social worker the passwords to the video cameras at her house so the Department could monitor who was coming in and out of the house. Father said he was willing to share his GPS data or to wear an ankle monitor to provide assurance that he would not interact with the children outside of supervised visits.

On June 28, the children underwent a forensic interview. Neither child made any new disclosures nor made any inappropriate comments. After the interview, the children were moved from their placement with the paternal aunt and uncle to a foster home in Riverside County.

Mother, Father, and the children all requested to set a contested jurisdictional and dispositional hearing. The hearing was continued multiple times and eventually set for October 24. In the meantime, the Department filed several addendum reports.

D. *The Addendum Reports—The Parents' Conduct*

The parents continued to live and visit the children separately. Both parents regularly visited the children. Both parents were also actively attending therapy and had completed multiple parenting classes.

On August 5, Mother reported that the children were her priority and she did not plan on getting back together with Father. On September 5, Father reported that he and Mother were separated, but were not planning to get a divorce. On September 7, an

office assistant who works for the Department saw Mother and Father together at a Ralph's grocery store holding hands. Mother leaned over and kissed Father's neck. When Mother saw the office assistant, she quickly let go of Father's hand and they walked away in separate directions. Mother later denied running into the office assistant. Mother said it could not have been her because she shops at a different grocery store.

On November 25, Mother told the social worker that Father has stayed out of the home and they do not see each other. Mother promised she would not allow Father near the children if they were returned to her care. Mother offered to put cameras inside her home and give the Department the password. She said she would keep the children safe if they were returned to her care. Mother acknowledged that she attends Father's criminal proceedings but said she does so to learn firsthand what is happening, not to support Father. Mother said she had not seen anything with her own eyes to support the allegations and asked the social worker to "'[p]rove to me what he did.'" Mother said she did not have an issue with adult pornography, but child pornography, even if it was anime, is "disgusting." Mother said the Department misunderstood her; she never said she was okay with Father watching or possessing child pornography, even if it was anime. She said if Father is convicted of possessing child pornography, she will file for a divorce. She does not want her children "'around a felon.'"

E. *The Addendum Reports—The Children's Conduct*

1. *Nightmares and Incontinence*

The addendum reports reflected that both children were experiencing nightmares and having issues with incontinence. On July 15, caregiver April Aldaco (April) reported

12

that after parent visits, A.H. "has been screaming in the middle of the night." O.H. had done it once too, although "his was more tossing and turning and making whining/bothered noises." The children's nightmares and restless sleep continued into October. On October 4, April reported that O.H. occasionally kicks the wall next to his bed, and will scream, some nights louder than others.

The children were also having issues with incontinence. On September 5, it was reported that O.H. had pooped in the shower two days in a row. He said he did not know he could get out of the shower to use the toilet. It was also reported that A.H. peed on herself in the kitchen on one occasion and soiled herself on another occasion after a therapy session.

2. *A.H.'s Masturbation*

On July 15, caregiver April expressed concern about A.H.'s "need for touch." April reported that A.H. "pretty regularly tries to climb on us, sit on our lap, press her body against us to cuddle, especially my husband and we have to redirect her a lot." April reported that her husband, caregiver K.C. Andrew Aldaco (KC) was concerned that A.H. "is way too comfortable using her body especially with him." Lately, A.H. had been trying to kiss KC on the lips with her mouth open. On another occasion, when KC was putting A.H. to bed, A.H. said, "'You're gonna have to show me your privates now.'" A.H. had also tried to touch O.H.'s tongue with her tongue and kept trying when O.H. told her no.

On July 29, April reported that A.H. "was masturbating again." As April described it, A.H. was lying on a blanket on the floor in the front room of the family's

home.  O.H. was next to her playing a game on his tablet.  A.H. covered herself with a blanket, flipped onto her stomach, and started touching herself and thrusting her pelvic area onto the blanket below her.  April asked A.H. to stop, and they went to the store for a change of scenery.  While they were in the car, April asked A.H. if she was touching her private parts.  A.H. said, yes, "'sometimes my vagina gets stuck to my underwear.'"  April asked if it takes a long time to fix, or if it can be fixed quickly.  A.H. responded, "'well it takes a long time to get warm.'"  April asked A.H. where she heard that it needs to be warm.  A.H. said, "'well my mom showed me to do that.  She said she did that when she was a little girl.'"  April asked A.H. how her mom showed her, and A.H. said, "'she lay on the bed and showed me.'"  April told A.H. if it happens again to go into the bathroom and fix her underwear in private.

When the caregivers told the doctor about A.H. touching herself, the doctor said it was not normal behavior as children's bodies do not normally arouse at that age.

The social worker spoke with A.H. on August 5.  A.H. told the social worker that she touched her private parts to unstick her underwear and when her vagina was cold.  A.H. explained that when her vagina was cold, she would roll up a blanket and put her hands around the blanket with her fingers together.  She would then lay down on the blanket and thrust her hips while moving her hands up and down.  A.H. said Mother taught her how to do this, and that Mother said she had also done this when she was a little girl.  A.H. said they were in Mother's bed when Mother taught her this, and Father was relaxing in the massage chair nearby.  She said both parents were clothed.  The only time A.H. ever saw Father touch his private parts was when he used the restroom.  A.H.

14

also said they took showers together as a family.  The social worker reported this information to law enforcement.

Mother later denied that she taught A.H. to masturbate.  Mother said she "never taught [A.H.] to do anything like that or show her."  Father said it had been years since A.H. last masturbated, and it had also concerned them.  Father said they took A.H. to a pediatrician about it, and the pediatrician said it was normal and not to shame her, but to talk to her about doing it privately.

Mother provided the social worker with a screenshot from the Blueberry Pediatrics application that showed she contacted a pediatrician about A.H.'s masturbation in October 2022.  The screenshot showed an online chat.  In the chat, Mother stated, "[A.H.] likes to hump things, like pillow, piles of blanket or a big stuffed animal.  Is this normal at her age?  My son never did this when he was 3."  A doctor responded, "Hi there its Dr. Kay, sometimes it is normal to do these things as an exploration.  Does she do it a lot?  Does she touch herself or anything?  Does she say anything about what she is doing?"  Mother responded, "She doesn't do it a lot.  Doesn't really touch herself.  She doesn't anything about it [*sic*] she just happily does it.  Mostly on fluffy things like pillows."  A different doctor responded, "It's very normal!  It's important not to make it a big deal or shame her.  You can teach her that it's something that's private and should be when alone not for others to see."

On August 30, after the addendum report addressing A.H.'s masturbation was filed, the children's counsel put the parties on notice that she would be seeking a bypass of reunification services as to both parents.

3. *O.H.'s Masturbation and Reports of the Family Showering Together*

On October 17, the Department received a referral that there were signs O.H. had been masturbating in the shower. It was reported that O.H. admitted to masturbating and said he was shown how to do it when he was two years old, although he could not recall if it was Mother or Father that showed him.

After receiving the referral, the social worker and a police officer spoke with the children. O.H said that "'sometimes'" his whole family showered together—Mother, Father, O.H, and A.H. O.H. said Father would help him wash his hair, and that they showered with their clothes on. O.H.'s demeanor changed when the social worker asked him if he had been touching himself while in the shower and masturbating. O.H. said he did not know what she was talking about or know what that was.

A.H. told the social worker that she would shower once a week at home. She said she would shower with O.H., and sometimes with Mother and Father too. A.H. said they would all shower together in the "'tiny shower.'" The social worker asked if they would shower with their clothes on or off, and A.H. responded, "'[w]ithout clothes silly.'"

F. *The Jurisdictional and Dispositional Hearing*

The contested jurisdictional and dispositional hearing was held over the course of four days between October 24 and December 6.

1. *The Exhibits*

Father filed several exhibits, one of which was the forensic examination report prepared by the Riverside County District Attorney's Office that documented what was recovered in the search of the parents' electronic devices.

Mother's exhibits included a screenshot of the Blueberry Pediatrics online chat where Mother inquired about A.H.'s masturbation, and a report from her therapist, Dr. Howard Asher. Dr. Asher's report was critical of the Department's assessment and recommended returning the children to Mother.

The children's exhibits included after-visit summaries from their medical appointment on October 22. The after-visit summaries reflect that O.H. was diagnosed with bedwetting; urinary incontinence, unspecified type; and microscopic hematuria. A.H. was diagnosed with postnasal drip; bedwetting; suspected child abuse; urinary incontinence in female; and incontinence of feces, unspecified fecal incontinence type. The doctor referred both children to cognitive behavioral therapy for further evaluation and assistance with their incontinence, given their history of "suspected sexual abuse from previous residency."

The Department's exhibits included the social worker's reports, the felony complaint in Father's criminal case, and the report Detective Marcinko prepared for the Riverside County District Attorney's Office (which the parties referred to as a police report).

The court received all of the exhibits into evidence. The only exhibit that any of the parties objected to was Dr. Asher's report. The court received the report "simply as a report" and not an expert document.

The Department and Mother submitted on their exhibits.

17

2. *The Testimony*

a. *Social Worker Hilda Leyva*

Father's counsel called social worker Hilda Leyva. Leyva testified that she was assigned to the case after the detention hearing. Leyva did not personally review any of the police reports or the pornographic images Father possessed, although she spoke with Detective Marcinko who described the images to her.

Leyva also testified that both children reported their parents taught them how to masturbate and that they had showered together as a family. O.H. did not specify which parent had taught him how to masturbate, and he said they wore clothes when they showered together as a family. A.H. said Mother taught her how to touch herself, and they did not wear clothes when they showered together as a family. A.H. demonstrated for Leyva how A.H. would touch herself. A.H. laid face down on the floor and thrust her hips while moving her hands up and down. Leyva demonstrated in court how A.H. held her hands in a triangle position with her fingers and thumbs together.

Leyva believed the children's disclosures presented safety concerns, but she recommended the court provide reunification services to the parents because it was her understanding that there was not an applicable bypass provision.

b. *Caregivers April and KC*

The children's counsel called the caregivers, KC and April. At the time they testified, the children had been living with them for just over four months. Both caregivers testified that when the children arrived they were having nightmares and

18

screaming in the night. KC said the nightmares have subsided. April said they were still occurring.

As to the children's incontinence, KC testified that the children started having "potty accidents" about a month after they arrived. KC recently took the children to the doctor to address the issue. The doctor asked if the children had a history of trauma, and KC told the doctor that he believed there had been sexual trauma. KC was not sure where he came up with that information. He may have read it or heard it from someone.

As to A.H., both caregivers testified that they had seen A.H. touching herself. As April described it, A.H. "puts her hands into her crotch, laying facedown on the bed and the carpet, and she pushes her hips back and her buttocks into the air, pushes into her hands, into the bed and the carpet with rhythmic motion, also making breathing noises that go along with the rhythmic motion, and some sounds of moaning." April had seen A.H. do this four times—twice in the living room and twice in bed. A.H. told April that Mother showed her how to do that when she was two. KC did not believe it was normal for such a young child to touch herself like that. April found the behavior "concerning."

April also testified that A.H. uses words like "'vagina,' 'nipple,' [and] 'penis,'" and likes to climb on April's lap. As April described it, A.H. presses her pelvic area deep into April's hips, and if April carries her, A.H. "squeezes very hard and won't let go." April does not let A.H. climb on her because "[A.H.] grinds her crotch into me." A.H. would also climb onto KC's lap and press her body into him. It made KC uncomfortable. A.H. had also asked to kiss KC on the mouth, and on one occasion when KC was putting A.H. to sleep, A.H. told KC that "[KC] was going to have to show" A.H. his privates.

19

As to O.H., April testified that she had seen O.H. doing pelvic thrusts into the bed on two occasions. Both times were in the middle of the night and O.H. appeared to be sleeping.

KC testified that on "several occasions" he noticed the smell of semen in the bathroom after O.H. showered. This led KC to ask O.H. if he played with his privates in the shower. O.H. seemed uncomfortable or embarrassed by the question, but he admitted, that yes he did. KC asked O.H. if he had been taught to do that, and O.H. said it was either his Mother or Father, and he was two years old at the time. O.H. has not engaged in any other sexual behavior towards his sister or anyone else in the home.

c. *Mother's Therapist Dr. Howard Asher*

Mother called her therapist, Dr. Howard Asher, to testify as a rebuttal witness. Dr. Asher testified that he had been counseling Mother for over two years. Before the children were detained, Dr. Asher saw the children "semi[-]regularly" during Mother's counseling sessions. He described the children as highly intellectual, very well adjusted, and eager to talk. Dr. Asher did not have any concerns about Mother's parenting, nor did he believe Mother minimized the allegations.

Dr. Asher testified that the children's current behavior, including having nightmares and screaming at night, could be indicative of trauma. He acknowledged the trauma could stem from sexual abuse, but said it could also stem from other things too, like being removed from the home. Given that the children had been removed from their home, Dr. Asher believed it was "restrictive and ridiculous" to "identify only sexual abuse as causing a night terror."

20

### 3. *Argument and Ruling*

Following the testimony, counsel for the Department asked the court to sustain the petition and grant reunification services with supervised visitation.

The children's counsel asked the court to amend the d-1 and d-2 sexual abuse allegations to conform to proof, to include the evidence that the parents taught the children how to masturbate, and as amended, to sustain the petition. The children's counsel also requested the court bypass reunification services to both parents under section 361.5, subdivision (b)(6), (7), and (17). Counsel argued that the parents taught the children to masturbate for the parents' own sexual gratification, which qualifies as severe sexual abuse and sexual exploitation under the bypass provisions.

Both parents argued the evidence did not support sustaining the allegations against them, and both opposed the children's request to bypass reunification services.

The juvenile court denied the children's request to amend the petition to allege that the parents taught the children how to masturbate. The court found the request would change the grounds of the allegations completely and not simply be an immaterial variance. However, the court amended the b-2 allegation (failure to protect as to Father) to clarify the allegation. The court removed the reference to "chi[ld] pornography" and replaced it with a description of the specific images at issue.[5]

---

[5] As amended, the b-2 allegation read: "'Father neglects the health, safety, and well-being of the children, in that on or about May 21st, 2024, law enforcement officers conducted a search warrant due to Father's Internet accounts containing photographs of his children's genitalia, a photograph of an adult female orally copulating a preteen boy, a photograph of a 14-year-old girl's breast and genitalia, and dozens of anime images of

21

The court also denied the children's request to bypass reunification services. The court concluded it could not make the requisite findings by clear and convincing evidence, "no matter how much [the court] would like to." The court stated it had "no doubt" that the parents were "clearly inappropriate in raising their children, that instead of helping their children grow up to be healthy and—sexually healthy, they've done damage to these kids, and it's going to take significant time to help these kids overcome the negligent acts of these parents." Yet at the same time, the court had issues with the credibility of the children's reports about what happened, and had "serious doubts" about KC's testimony that he smelled semen in the shower. The court did not know how "reasonably one could believe [KC's] testimony" based on O.H. being a prepubescent, seven-year-old boy. The court stated it would give the parents the chance to reunite with their children but would not guarantee it. The court expected the parents to accept responsibility for what they had done. This included Father addressing his addiction to pornography, and Mother addressing her unwillingness to protect her children from a father "who clearly has an addiction to child pornography."

As amended, the court found all of the allegations in the petition true. The court sustained the petition, ordered the children removed from both parents under section 361, subdivision (c)(1) and (4), and ordered the Department to provide reunification services to both parents. The court also ordered supervised visitation to continue as previously

children engaging in sexual acts with adults including rape and bondage, resulting in Father's arrest. In addition, that Father has prior referral history with allegations of sexual abuse of [a] minor.'"

22

set, and ordered both parents to submit to a psychological evaluation—Mother's to address codependency and the inability to protect her children, and Father's to address sexual violence or sexual crimes. The court also ordered Father not to view any pornographic images of adults or children, and to allow the Department to inspect his electronic media at any time. Finally, the court ruled that the Department did not have the discretion to return the children to their parents without first obtaining express court authorization to do so.

Mother, Father, and the children each timely filed a notice of appeal.

## DISCUSSION

### I.

### *The Parents' Appeals*

The parents contend the record does not contain substantial evidence to support the juvenile court's jurisdictional findings or the dispositional order removing the children from Mother. We disagree.

A. *Justiciability*

As a preliminary matter, we address the Department's assertion that the parents' appeals are not justiciable.[6] The Department contends the parents' appeals should be

---

[6] The children also contended the parents' appeals are not justiciable. But they raised the issue in the reply brief they filed in their own cross appeal, rather than the respondent's brief they filed in the parents' appeals. Mother then filed a motion to strike the minors' justiciability argument because it was a substantive argument raised for the first time in a reply brief.

Points raised for the first time in a reply brief are not ordinarily considered, because such consideration would deprive the respondent of an opportunity to counter the

23

dismissed because they did not challenge all of the jurisdictional findings—Father did not challenge the failure to protect allegation (b-2) or the dispositional order as to himself, and neither parent challenged the abuse of sibling allegation (j-1).

As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and will render moot a challenge to the other jurisdictional findings. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.) "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "However, where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot." (*In re D.P.* (2023) 14 Cal.5th 266, 283.)

Mother's appeal is justiciable because she is challenging the dispositional order removing the children from her care and the jurisdictional findings against her that

argument. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.) Here, the parents were not deprived of the opportunity to counter the justiciability argument because the Department also raised the issue. We therefore deny Mother's motion to strike as unnecessary. However, to the extent the children's argument differs from the Department's argument on this issue, we will disregard it. (See *Granite Construction Co. v. American Motorists Ins. Co.* (1994) 29 Cal.App.4th 658, 667, fn. 8.)

formed the basis for the removal order (b-1 and d-1).  (*In re D.P.*, *supra*, 14 Cal.5th at p. 283.)

Father's appeal is also justiciable.  Father's briefing focuses primarily on the section 300, subdivision (d) allegation, although he also, if somewhat less directly, challenges the subdivision (b) allegation.  Both allegations are based on Father possessing pornographic images of children.  Father quotes section 300, subdivision (b) in his briefing and contends the evidence was insufficient to support the jurisdictional findings because the images at issue were not offered as evidence.  We understand his argument to incorporate a challenge to the section 300, subdivision (b) allegation.

Neither parent specifically challenged the jurisdictional finding under section 300, subdivision (j), abuse of sibling.  However, we do not consider that a basis for dismissing the appeals because the subdivision (j) allegation was premised on a true finding on the subdivision (d) allegation.  Thus, if we were to agree with the parents' arguments and reverse the subdivision (d) allegation, we would be obligated to also reverse the subdivision (j) allegation.

We therefore deny the request to dismiss the parents' appeals.  However, because neither parent specifically challenged the section 300 subdivision (j) allegation, we do not address the sufficiency of the evidence as to that allegation.

B  *Standard of Review*

"In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we 'consider the entire record to determine whether substantial evidence supports the juvenile court's findings.'"  (*In re*

*L.W.* (2019) 32 Cal.App.5th 840, 848; *In re I.J.* (2013) 56 Cal.4th 766, 773.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) The appellant has the burden of showing the court's findings and orders are not supported by substantial evidence. (*Ibid*.)

C. *The Jurisdictional Findings*

At issue here are the juvenile court's jurisdictional findings under section 300, subdivisions (b) and (d).

Under section 300, subdivision (b)(1), the juvenile court may exercise jurisdiction over a child, if the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … [¶] … [t]he failure or inability of the child's parent … to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).) A jurisdictional finding under this provision "requires the Department to prove the following elements by a preponderance of the evidence: '(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.'" (*In re S.R.* (2024) 104 Cal.App.5th 44, 53.) "The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing '"subject the minor to the defined risk of harm."'" (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.)

The juvenile court may exercise jurisdiction under section 300, subdivision (d), if the child "has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent …, or the parent … has failed to adequately protect the child from sexual abuse when the parent … knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d).)  Penal Code section 11165.1 defines "'sexual abuse'" to mean "sexual assault or sexual exploitation."  Sexual assault includes "[t]he intentional touching of the genitals or intimate parts … of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification." (Pen. Code, § 1165.1, subd. (b)(4).)  Sexual exploitation includes downloading, streaming, or accessing through any electronic or digital media, images or a video recording of a child engaged in sexual conduct. (Pen. Code, § 11165.1, subd. (c)(3); *In re Ulysses D.* (2004) 121 Cal.App.4th 1092, 1098.)

Section 300, subdivisions (b) and (d), do not require a child to have been abused or neglected before the juvenile court can assume jurisdiction.  They "require only a 'substantial risk' that the child will be abused or neglected." (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

1. *Father's Challenge to the Jurisdictional Findings*

Father contends there is not substantial evidence in the record to support the jurisdictional findings under section 300, subdivisions (b) and (d), because the pornographic images of children that he was alleged to possess were not introduced into evidence, and without them, there was no way for the court to determine the age of the

27

children in the images. Thus, he contends, the court's jurisdictional findings were based on speculation and conjecture.[7]

We disagree. The description of the images in the record provides substantial evidence to support the juvenile court's jurisdictional findings.

Before getting to Father's argument, we briefly address the Department's forfeiture claim. The Department contends that Father forfeited the issue by failing to request the images be admitted into evidence below. We reject this argument. The Department bore the burden of proving that Father possessed child pornography. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Father was not under any obligation to present the images himself, and his failure to do so does not preclude him from raising a substantial evidence claim on appeal. (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 [contention that a judgment is not supported by substantial evidence can be raised for the first time on appeal].)

Here, rather than presenting the images, the Department proceeded on Detective Marckino's description of the images as stated in the police report and the detention report prepared by the social worker. Father did not object to the admission of either of these reports or to the court's reliance on the hearsay statements contained within them. The court specifically asked if there were any objections to the police report, and Father's

---

[7] In connection with his appeal, Father filed a petition for writ of habeas corpus that alleged "all counsel" were ineffective in allowing the juvenile court to make jurisdictional findings without any of the attorneys or the court having viewed the pornographic images at issue. We address the petition in a separate order filed in *In re J.H.*, E085652.

counsel responded, "No, your Honor." Father also offered as his own exhibit the forensic examination report prepared by the Riverside County District Attorney's Office that documented what was found in the search of the parents' electronic devices. It was clear from the record that all parties, including Father, chose to proceed on the description of the images, rather than the images themselves.

"'In judicial proceedings, the rule is well established that incompetent hearsay admitted *without objection* is sufficient to sustain a finding or judgment.'" (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 430–431; accord, *Crocker-Anglo Nat'l Bank v. American Trust Co.* (1959) 170 Cal.App.2d 289, 299 [hearsay evidence "offered and received without objection, may be considered in support of the judgment"].)

Moreover, in dependency proceedings, absent a timely objection, "[a] social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based." (§ 355, subds. (b), (c)(1); *In re E.B.* (2010) 184 Cal.App.4th 568, 577, overruled on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) The detention report prepared by the social worker qualified as a "social study" under section 355. (§ 355, subd. (b)(1) ["'social study' means any written report furnished to the juvenile court and to all parties or their counsel by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding"].)

29

Because Father did not object to the detention report or the police report, and he personally offered the forensic examination report, we find no error in the juvenile court admitting these reports into evidence and relying on the hearsay statements within them.

These reports reflect that in addition to the photographs of his children's genital rashes, Father's Google account contained three close-up photographs of the vaginal area of a prepubescent girl with a Hello Kitty blanket in the background, a screenshot of a video that depicted an adult female orally copulating a 10- to 12-year-old male child, and a "selfie" photograph of a 14- to 16-year-old female child exposing her breasts and vagina. Additionally, Father's cell phone contained two photographs of sex acts being done to female subjects who were "age difficult," and between his cell phone and the tower computer that was seized from the family home, Father possessed hundreds of anime and computer-generated images of children engaging in sex acts, including several images of a prepubescent girl between the ages of 8 and 10, engaged in unwanted and violent sexual activity with an adult.

Based on Father's possession of these images, the juvenile court sustained the section 300, subdivision (b) and (d) allegations as to Father. (See *In re S.R.* (2020) 48 Cal.App.5th 204, 206–207 [a parent's possession of child pornography can support jurisdictional findings under § 300, subds. (b) & (d)].)

Father does not appear to dispute the proposition that a parent's possession of child pornography can support jurisdictional findings under section 300, subdivisions (b) and (d). Rather, he takes the position that he did not possess any child pornography. He contends that the photographs he possessed of his children's genital rashes were not

30

pornographic because they were taken for medical purposes, and that the anime and computer-generated images he possessed do not qualify as child pornography because they are not images of actual children.

Father is correct that animated and computer-generated images of children engaging in sex acts are not considered child pornography for purposes of criminal liability because such images do not involve actual children. (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 239–240, 250–253; *People v. Gerber* (2011) 196 Cal.App.4th 368, 382.) This does not mean, however, that the juvenile court was required to disregard the fact that Father possessed hundreds of sexually explicit computer-generated images of children. These images were relevant to the juvenile court's assessment of whether the children were at risk of harm. (Cf. *People v. Westerfield* (2019) 6 Cal.5th 632, 686, 695–697 [in prosecution for murder, kidnapping, and possession of child pornography, "anime images showing forcible sexual acts with pubescent girls were admissible on the issue of defendant's possible motive and intent"].) The same goes for the photographs Father possessed of his children's genital rashes. The photographs may initially have been taken for medical purposes, yet Father continued to possess the photographs three or four years after he sent them to the children's doctor. The court could consider that fact in assessing whether the children were at risk of harm.

Additionally, as noted, Father possessed at least two sexually explicit photographs of actual children in his Google account—the screenshot of a male child being orally copulated and the "selfie" of the female child showing her breasts and vagina. There were also three close-up photographs of the vaginal area of a prepubescent girl with a

31

Hello Kitty blanket in the background that were identified separately from the children's genital rash photographs. We therefore reject Father's argument that he did not possess child pornography.

We also note that in addition to the sexually explicit photographs and computer-generated images of children that Father possessed, there was also evidence that on two occasions, Father's user account conducted a keyword search for the term "'lolita'" on an anime website that included sexual content. "'Lolita' [is] a common term used to describe underage girls" on pornographic websites. (*Tecklenburg v. Appellate Division* (2009) 169 Cal.App.4th 1402, 1408.) Father also had at least nine prior referrals that alleged he sexually abused his minor sister Z.H., and at least one prior referral that he sexually abused his minor brother. The referrals were deemed unfounded, inconclusive, or evaluated out, but when considered in conjunction with the rest of the evidence, they reflect a concerning pattern of accusations of inappropriate sexual conduct with an underage family member.

We therefore conclude there was substantial evidence in the record to support the jurisdictional findings as to Father under section 300, subdivisions (b) and (d).[8]

---

[8] Father has also requested that we take judicial notice of the April 22, 2025, order dismissing his criminal case. (Riverside County Superior Court, no. SWF2401126.) The Department and the children oppose his request. We deny Father's request for judicial notice.

Father asserts his criminal case was dismissed because "[t]he Riverside County District Attorney's Office could not locate any child pornography on [Father's] devices." But the minute order Father provided did not give a reason for the dismissal. We decline to speculate why the district attorney's office decided not to pursue charges against Father. In any event, the dismissal occurred several months after the jurisdictional and

32

2. *Mother's Challenge to the Jurisdictional Findings*

The jurisdictional findings as to Mother under section 300, subdivisions (b) and (d) were based on a failure to protect theory. The b-1 allegation alleged that Mother knew, or reasonably should have known, that Father possessed child pornography and images of the children's genitals, yet she minimized the severity of the allegations and continued to allow Father to have access to the children. The d-1 allegation alleged that Mother knew, or reasonably should have known, that Father was in possession of child pornography and images of A.H.'s genitals, yet she failed to take any protective measures, such as contacting law enforcement, and she continued to minimize the severity of the allegations and continued to allow Father to have access to the children.

Mother contends these jurisdictional findings must be reversed because there was insufficient evidence that she knew or reasonably should have known that Father possessed child pornography, that she minimized the seriousness of the allegations, or that she failed to protect her children.

While we agree there was no evidence presented that Mother knew Father possessed child pornography, we conclude there was substantial evidence that Mother reasonably should have known that Father possessed child pornography, and that Mother minimized the seriousness of the allegations and failed to protect her children.

---

dispositional hearing, and we will not consider "postjudgment evidence going to the merits of an appeal and introduced for the purposes of attacking the trial court's judgment." (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676.)

33

Mother acknowledged that she had full access to Father's electronic devices and that she watched pornography with Father. She would therefore reasonably have known that Father possessed thousands of files of pornography on his devices, including hundreds of anime and computer-generated images of children engaging in sex acts with adults. Mother told the social worker she was not concerned about the anime images because they were not illegal.

The closer question is based on this evidence, whether Mother reasonably should have known that Father possessed child pornography. Of the thousands of pornographic files Father possessed, there were only a handful of images involving actual children that qualify, or potentially qualify, as child pornography—the screenshot of the male child being orally copulated, the "selfie" photograph of the female child exposing her breasts and vagina, the two photographs of sex acts being done to female subjects who were "age difficult," and the three close-up photographs of the vaginal area of a prepubescent girl with a Hello Kitty blanket in the background.

Although we consider the question close, we conclude there was sufficient evidence to establish by a preponderance of the evidence that Mother reasonably should have known Father possessed child pornography. Mother was aware, based on the amount of pornography that Father possessed, that Father had a heightened, if not obsessive, interest in pornography. She was also aware that Father possessed photographs of their children's genitals and she had full access to the electronic devices where Father stored his pornography, including the tower computer in the family home

34

where Father had over 100 computer-generated images of a prepubescent girl engaging in sexual activity with an adult.

There was also substantial evidence that Mother minimized the seriousness of the allegations and failed to protect her children. After Father posted bail, Mother picked Father up from jail and brought him back to the family home. The next day, Mother, Father, and both children were at home together when the social worker made an unannounced visit. Mother told the social worker that she did not believe the charges were true and that she would still leave the children with Father. Mother repeatedly told the social worker it was not illegal to watch anime child pornography.

Mother's counsel acknowledges that Mother initially minimized the allegations but contends that by the time of the jurisdictional hearing Mother had recognized the seriousness of the allegations and said she would never be okay with Father having or watching child pornography, even if it was anime.

While true, that is not the full extent of the facts. In the same conversation where Mother told the social worker she would not be okay with Father possessing child pornography, she made it clear that she still believed Father had not done anything wrong. She told the social worker that she had not seen anything with her own eyes to support the allegations, and she insisted the social worker "'[p]rove to me what he did.'" That conversation was just two weeks before the court issued its jurisdictional and dispositional ruling, and it provides substantial evidence to support a finding that at the time of the jurisdictional hearing Mother was still minimizing Father's conduct and not acting in a manner that was protective of the children. (See *In re L.Y.L.*, *supra*, 101

35

Cal.App.4th at p. 947 ["we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion"].)

Accordingly, we conclude there was substantial evidence in the record to support the court's jurisdictional findings as to Mother under section 300, subdivisions (b) and (d).

D. *The Removal Order*

Both parents also challenge the dispositional order removing the children from Mother. Mother contends that because there was no basis for the jurisdictional findings, there was also no basis for the removal order. Father contends there were other reasonable means to protect the children without removing them from Mother. We reject both arguments.

The juvenile court ordered the children removed under section 361, subdivision (c)(1) and (4). Under those provisions, the juvenile court may order a child removed from his or her parent if the court finds by clear and convincing evidence: that the child is at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal (§ 361, subd. (c)(1)), or that the child or a sibling of the child has been sexually abused or is deemed to be at substantial risk of being sexually abused by a parent and there are no reasonable means by which the child can be protected without removal (§ 361, subd. (c)(4)).

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.) The parent need not be dangerous, and the child need not have been actually harmed before removal is appropriate. The focus of section 361 is on averting harm to the child. (*In re N.M.*, *supra*, at pp. 169–170) In assessing whether removal is appropriate, the juvenile court may consider the parent's past conduct as well as the present circumstances. (*Id*. at p. 170.)

Here, too, we apply the substantial evidence test in reviewing the juvenile court's dispositional findings and removal order, keeping in mind the higher standard of clear and convincing evidence. (*In re L.O.* (2021) 67 Cal.App.5th 227, 245.)

In issuing its dispositional order, the juvenile court found that in light of the night terrors the children were experiencing and the sexual conduct the children were engaging in, particularly A.H., it would not be safe to return the children to the parents until the parents had taken responsibility for their actions. This included Father addressing his addiction to pornography and Mother addressing her unwillingness to defend and protect her children from a father "who clearly has an addiction to child pornography."

Substantial evidence supports the juvenile court's findings and removal order. Throughout the proceedings, Mother minimized Father's conduct and did not acknowledge the risk it posed to the children. When Mother first spoke with the social worker after Father was arrested in May, she said she did not believe the charges and that she would still leave the children with Father. Father then moved out of the family home,

and over the next few months it appeared Mother was beginning to appreciate the gravity of the situation. In August, she said the children were her priority and that she did not plan on getting back together with Father. But then in September, an office assistant for the Department saw Mother at a grocery store holding hands with Father and kissing his neck. When Mother saw the office assistant, she quickly let go of Father's hand and they walked away in separate directions.[9] In her last reported statement to the social worker in November, Mother was adamant that she would keep the children safe and would not let Father near the children if they were returned to her. Yet she also made it clear that she still believed Father had not done anything wrong. She continued to maintain that she had not seen anything to support the allegations, and she insisted that the social worker prove to her what Father had done.

Mother's continued minimization and insistence that Father has not done anything wrong reflects that she still does not appreciate the risk that Father's conduct poses to the children. And when her failure to appreciate the risk is considered with her history of lying about, or at a minimum, concealing her continued interaction with Father from the Department, it was reasonable for the juvenile court to conclude that it would not be safe to return the children to Mother. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was

---

[9] Following oral argument, Mother filed a petition for writ of habeas corpus that alleged her trial counsel was ineffective for failing to challenge the report that she was seen in the grocery store with Father. We address the petition in a separate order filed in *In re J.H.*, E087069.

no reason to believe the conditions would not persist should the minor remain in her home"].)

Father contends there were other reasonable means to protect the children without removal. He argues that Mother's offer to provide the social worker with passwords to the cameras located in and around the family home, and Father's offer to wear an ankle monitor and to share his GPS data were sufficient safeguards to protect the children. We agree with the Department that this was not a reasonable alternative to removal. In addition to the privacy concerns that would be implicated if the Department had around-the-clock access to cameras inside the home, it would not be feasible for a social worker with an otherwise full caseload to monitor the cameras and Father's GPS data to ensure the children's safety.

Accordingly, we conclude substantial evidence supports the juvenile court's removal order. Removing the children from Mother was necessary to protect the children, and there were no other reasonable means by which the children could be protected without removal.

## II.

### *The Children's Appeal*

The children contend the juvenile court erred in denying their request to bypass reunification services to the parents. They assert the bypass provisions of section 361.5, subdivision (b)(6) and (b)(7) apply. The parents contend the juvenile court properly concluded the bypass provisions do not apply. The Department does not take a position

on this issue. We conclude the juvenile court properly denied the children's request to bypass reunification services.

"[W]hen a child is removed from the custody of their parent, the juvenile court *must* provide the parent with reunification services *unless* it finds by clear and convincing evidence the case falls within one of the 17 enumerated exceptions in section 361.5, subdivision (b), commonly called 'bypass provisions.' (See § 361.5, subd. (a).) If the court finds by clear and convincing evidence that a bypass provision applies, it must deny services unless the parent proves that services would be in the child's best interests. (§ 361.5, subd. (c).)" (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.)

The bypass provision of section 361.5, subdivision (b)(6), applies if "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse … to the child, a sibling, or a half sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).) "A finding of severe sexual abuse, for the purposes of this subdivision, may be based on, but is not limited to, sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between the parent or guardian and the child or a sibling or half sibling of the child, or between the child or a sibling or half sibling of the child and another person or animal with the actual or implied consent of the parent or guardian; or the penetration or manipulation of the child's, sibling's, or half sibling's genital organs or rectum by any animate or inanimate object for the sexual gratification of the parent or guardian, or for the sexual

gratification of another person with the actual or implied consent of the parent or guardian." (§ 361.5, subd. (b)(6)(B).)

The children contend that the parents' conduct in teaching the children how to masturbate qualifies as "severe sexual abuse" under section 361.5, subdivision (b)(6), because it involved "manipulation of the child's, sibling's, or half sibling's genital organs … by any animate … object for the sexual gratification of the parent."

The problem with the children's argument is the conduct that they assert satisfies the bypass provision was not a basis on which the juvenile court sustained jurisdiction. The plain language of section 361.5, subdivision (b)(6), requires the child to have "been adjudicated a dependent … as a result of severe sexual abuse." (§ 361.5, subd. (b)(6)(A).) Here, the petition did not allege, and the juvenile court did adjudicate the children dependents based on the parents teaching the children how to masturbate. The Department never filed an amended petition alleging such conduct and the juvenile court denied the children's request to amend the petition to proof to allege the parents taught the children how to masturbate. The court found that doing so would violate due process because it would change the nature of the allegations. (See *In re I.S.* (2021) 67 Cal.App.5th 918, 929–930 [juvenile court cannot amend a petition to conform to proof to include allegations that materially differ from the original petition].) Thus, the children were adjudicated dependents "as a result" of Father's possession of child pornography and Mother's apparent knowledge of it, minimization of the allegations, and failure to protect the children. (§ 361.5, subd. (b)(6)(A).) This does not qualify as "severe sexual abuse" under the statute. (§ 361.5, subd. (b)(6)(B).)

41

However, even if we were to agree with the children that unalleged conduct could form the basis for the denial of reunification services under section 361.5, subdivision (b)(6), we find no error in the trial court denying their request to bypass reunification services.

As the party seeking to bypass reunification services, the children bore the initial burden of proving by clear and convincing evidence that a bypass provision applied. (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 521, overruled on other grounds in *Conservatorship of O.B.*, *supra*, 9 Cal.5 at p. 1010, fn. 7; *In re T.R.*, *supra*, 87 Cal.App.5th at p. 1148.) Clear and convincing evidence "requires proof making the existence of a fact highly probable." (*Conservatorship of O.B.*, at p. 995.) The juvenile court concluded the children did not meet that burden.

When the party with the burden of proof did not carry their burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.)

Here, there was evidence that the children reported their parents taught them how to masturbate when they were two years old. A.H. said Mother got on the bed and demonstrated how to do it, while Father was sitting in the massage chair nearby. O.H.

42

also reported that one of his parents (he could not remember which one) taught him how to masturbate. O.H.'s disclosure was made to caregiver KC, after KC reportedly smelled semen in the shower and asked O.H. if he had been touching himself.

In assessing this evidence, the juvenile court had "some issues as to the credibility of the children's reports of what happened," and it had "serious doubts" about KC's testimony that he smelled semen in the shower considering O.H. was a prepubescent, seven-year-old boy. We defer to the juvenile court's credibility findings. (*In re S.G.* (2021) 71 Cal.App.5th 654, 672.) We also note that the evidence about whether Mother taught A.H. to masturbate was conflicting. Mother denied having done so, and she provided the social worker with documentation that in October 2022 she sought medical advice about A.H. masturbating through the Blueberry Pediatrics application. Mother told the doctor that A.H. had been humping things like a pillow, blankets, and a stuffed animal, and she asked, "Is this normal for her age? My son never did this when he was 3." The fact that Mother sought medical advice to address A.H.'s masturbation supports Mother's claim that she did not teach A.H. to masturbate, and it provides conflicting evidence to A.H.'s claim that she did. We need not resolve this conflict. We simply note that given the conflicting evidence and the fact that the juvenile court had "issues" with the credibility of the children's reports about what happened, we cannot say the evidence compels a finding as a matter of law that the parents taught the children how to masturbate. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

Accordingly, we conclude the juvenile court properly denied the children's request to bypass reunification services under section 361.5, subdivision (b)(6).

The court also properly denied the request to bypass reunification services under section 361.5, subdivision (b)(7).  The bypass provision of section 361.5, subdivision (b)(7) applies when "the parent is not receiving reunification services for a sibling or a half sibling of the child" pursuant to section 361.5, subdivision (b)(3), (b)(5), or (b)(6). (§ 361.5, subd. (b)(7).)  Because we conclude the court properly denied the children's request to bypass reunification services under section 300, subdivision (b)(6), there was not a basis on which to bypass reunification services under section 300, subdivision (b)(7).

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

FIELDS
J.